THE STATE ex inf. ROBERT W. OTTO, Attorney-General, ex rel. WILLIAM R. HARRINGTON and MARTHA HARRINGTON, v. SCHOOL DISTRICT OF LATHROP, E. D. ROGERS and NORVAL W. STONUM.

In Banc, May 21, 1926.

1. **SCHOOL DISTRICT: Change of Boundaries.** A town school district may change its boundary lines in the same manner and according to the same procedure as may common school districts.

2. ———: **Consolidation of Town and Common School Districts.** The statute (Sec. 11252, R. S. 1919) provides a method by which common school districts adjoining a city or town may be attached for school purposes to the city or town district. But it is only upon the initiative of the common school district adjoining the town that it may be absorbed by the town district.

3. ———: ———: **Wrongful Procedure: Quo Warranto.** Where the people of a town and two adjoining common school districts attempted to attach the two adjoining districts to the town district by a method which the law does not authorize, the writ of ouster, in the suit of *quo warranto* challenging the authority of the town district to exercise jurisdiction over the territory of the common

school districts, would have to go, if there were nothing more in the case than the question relating to the regularity of the proceeding.

4. ———: ———: ———: Laches.  At the annual school meetings held on April 3, 1917, a town school district and two adjoining common school districts, after due notice, voted to extend the boundaries of the town district so as to embrace both country districts.  This manner of procedure to accomplish the consolidation of the three districts was not the method prescribed by the statute.  But the vote in favor of the proposition to so extend the boundaries of the town district was emphatic in all three districts; in one of the country districts there had been no school for four years, and the children therein had gone to the town school; after the vote in 1917 there was no school in either country district; the school houses were sold and the land on which they stood reverted to the original owners; all the school taxes thereafter collected in the country districts were collected for the town district and appropriated to maintaining the school in the town district, which maintained a school of eight grades, with an accredited high school of four years, employed twelve teachers, and conducted the high school for all the children in all of the former districts; the additional attendance from the country districts necessitated a readjustment of the appliances of the town district, with additional teachers and room; this condition continued for eight years before the institution of this suit, at the relation of two resident taxpayers of the country district, to oust the town district from exercising jurisdiction over the territory of those districts, and during all that time there was no complaint from the residents of those districts who sent children to the town school.  Held, that notwithstanding the method prescribed by the statute to attach the two country districts to the town district was not followed, the purpose sought to be accomplished was authorized by the statutes, and the relators have been guilty of such laches as to require a denial of their right to disturb the peaceful and useful situation.

5. LACHES: Irregularity: Acquiescence.  After long acquiescence and lack of complaint in the conduct of a public institution, such as a school district, there must be some reason for the disturbance of a present peaceable condition besides irregularity in the proceeding by which it was established, to justify a writ of ouster.

6. ———: Quo Warranto: Equitable Proceeding: Municipality.  Laches is an equity doctrine and relates to equity cases, but it is applied to municipal corporations in quo warranto proceedings and the like. The State by long acquiescence and continued recognition of a municipal corporation irregularly organized, may be precluded from bringing a quo warranto proceeding to deprive it of franchises long exercised.

7. ———: ———: **Acquiescence for Eight Years: Intervening Suit: Taxpayer.** A *quo warranto* to oust a town school district from exercising jurisdiction over territory included in two common school districts which were irregularly attached to the town district, brought by the State at the relation of two taxpayers who have no interest whatever in any school, and whose only purpose in bringing the proceeding is to escape the increased taxes caused by the inclusion of their lands in the town district, is barred by their acquiescence in the irregular consolidation for eight years after it was an accomplished fact, although four years previously they had brought a *quo warranto* against the directors of the town school district, but did not make the district itself a party and for that reason failed to obtain a writ ousting the district from exercising jurisdiction over the territory.

8. **QUO WARRANTO: Discretion: Useful Purpose.** The granting of a writ of *quo warranto* is a matter of discretion with the court. It will not be granted unless some useful purpose will be served by it. Unless some equity in favor of the State is shown, its laches will preclude it from an attempt to annul the proceeding by which two common school districts were irregularly attached to an adjoining town school district, where injurious results would follow from a dissolution of the consolidation. Where better schools have resulted from the consolidation of the districts, school conditions would not be improved by their dissolution, and no person who has children to educate or is interested in schools is complaining, no useful purpose will be conserved by ousting the town district from exercising jurisdiction over the territory formerly included in the two country districts, and the writ will be denied.

Corpus Juris-Cyc. References: Quo Warranto, 32 Cyc., p. 1416, n. 36; p. 1419, n. 52; p. 1424, n. 86; p. 1431, n. 42, 43. Schools and School Districts, 35 Cyc., p. 837, n. 6; p. 839, n. 16; p. 846, n. 70; p. 850, n. 94.

## *Quo Warranto.*

PROCEEDING DISMISSED.

*John A. Cross, R. H. Musser* and *Pross T. Cross* for relators.

(1) The attempt to change the boundary lines of the Lathrop School District so as to embrace and include the two adjoining country districts was illegal

and invalid, as found in State ex rel. v. Scott, 307 Mo. 250. It is there clearly held that the provision for "change of boundary lines" cannot be made the vehicle for consolidation. (2) The doctrine of laches had no application to the facts in this case.

*W. S. Herndon* and *Daniel H. Frost* for respondents.

(1) The petition to change the boundary lines of the Lathrop district was absolutely sufficient under the law. R. S. 1919, sec. 11201; State ex rel. v. Job, 205 Mo. 1. (2) A copy of this petition fully setting forth the change of boundary lines desired was attached to each notice that was posted and published, so that the notice was proper and sufficient. State ex rel v. Job, 205 Mo. 1. (3) Each district voted separately and the proposition was carried in each of them. This proposition having been ratified by all the districts became a fact, and this was made a record of and properly certified to the County Superintendent of Schools and to the office of the County Clerk. (4) The proceedings leading up to the election, were clean, without even the suggestion of fraud. Section 11201, while found in Article 3 relating to laws applicable to common schools, is by the statute in plain words made applicable to city, town and consolidated school districts, as to all provisions relating to change of boundary lines. Sec. 11253, R. S. 1919; State ex. inf. v. Sweazy, 270 Mo. 691; State ex rel. v. Thurman, 274 S. W. 800. (5) As it seems definitely fixed that Section 11201, relating to the change of boundary lines between common school districts, applies equally to city and town districts, the change of boundary lines in this instance was such a change as is contemplated by Section 11201. The effect of the change of boundary lines was to wipe out old Districts 44 and 45 by adding them as a total to School District of Lathrop. The intent and spirit of the statute is to permit the residents of the districts to adjust

the boundary lines as may seem best to them. In fact, this statute relative to change of boundary lines should be liberally construed. School Dist. v. New London Dist., 181 Mo. App. 589; School Dist. v. Chappell, 155 Mo. App. 498; State ex rel. v. Clymer, 164 Mo. App. 676; State ex rel. v. Dist., 238 S. W. 819; State ex rel. v. Job, 203 Mo. 34; State ex rel. v. Thompson, 260 S. W. 84; State ex rel. v. Hill, 152 Mo. 234. (6) The evidence shows that this change of the boundary lines of the Lathrop School District, so as to include all of the territory contained in former Common School Districts 44 and 45, was carried into effect immediately· following the annual meetings in Districts 44 and 45, and the annual election in Lathrop District, on the 3rd day of April, 1917. That from and after that date Districts 44 and 45 ceased to function or to exercise any of the purposes for which they were originally organized and that no annual meetings have been held prior to the date of the filing of the information in this case. That at four consecutive meetings in the district, 1914, 1915, 1916 and 1917, the voters had voted "No School." The principle of laches and acquiescence on the part of the State and its officers from the 3rd day of April, 1917, to the 21st day of March, 1925, the date of the filing of the information by the Attorney-General, a period of almost eight years, during which time the said school districts ceased to function as such, and all school revenues, from taxation of all property in the territory contained in the three districts and apportioned to all children in that territory, should forbid the legality to be questioned. State ex rel. v. Town of Mansfield, 99 Mo. App. 152; State ex rel. v. Town of Westport, 116 Mo. 582. Where a municipality has been recognized by court and officers for a number of years, the State is precluded from depriving it of its franchise. State ex rel. v. Town of Westport, supra; State ex rel. v. City of Carterville, 183 S. W. 1093; State ex rel. v. Miller, 113 Mo. App. 688. (7) The issuance of the writ of *quo warranto* is a discretionary matter with the court, and while the rule and practice in this State is that upon the filing of an information by the Attorney-

General the writ issues as a matter of course, upon final hearing the matter rests with the sound discretion of the court. State ex rel. v. Town of Mansfield, 99 Mo. App. 152; Stamper v. Roberts, 90 Mo. 683; Landrum v. Union Bank, 63 Mo. 48; Kitchen v. Railroad, 69 Mo. 224; Bradshaw v. Yates, 67 Mo. 221; State ex rel. v. Cupples, 283 Mo. 115. The Statute of Limitations does not govern. State ex inf. v. Lumber Co., 260 Mo. 284.

WHITE, J.—The Attorney-General on March 21, 1925, at the relation of the relators, filed in this court his information in the nature of a *quo warranto*, in which he challenges the authority of the School District of Lathrop to exercise jurisdiction over certain territory, which relators claim is not within the territory of that school district, but belongs to School Districts Nos. 44 and 45 in Clinton County, Missouri. Respondents filed their answer and return, setting up facts which they claim bring the disputed territory into the Lathrop District. The relators filed a reply, joining issue on certain averments of fact pleaded in the return.

Thereafter on July 3, 1925, this court appointed E. L. Alford special commissioner to take evidence upon the issues so joined and report to this court. The commissioner duly filed his report on January 11, 1926, transmitting with that report the evidence taken in pursuance of this court's order. The cause was argued and submitted during the January call of Court in Banc upon the record as thus presented.

It appears from the allegations of the petition, admitted in the answer, and the evidence produced here, that prior to April 3, 1917, the School District of Lathrop in Clinton County was a town school district with six directors and more than two hundred pupils of school age; that it contained within its boundaries certain lands described in the petition, comprising one and three-fourths sections. At that date School District No. 44 was a common school district adjoining the District of Lathrop on the east and comprised several sections of land.

School District No. 45 was a common school district comprising several sections adjoining the School District of Lathrop on the west.

At the regular annual meeting of all the school districts, April 3, 1917, the School District of Lathrop, School District No. 44 and School District No. 45 voted to extend the boundaries of the School District of Lathrop so as to include all the territory in the two country districts, Nos. 44 and 45. The illegality of that proceeding is asserted by the relators. They claim that the proceeding was void, and the School District of Lathrop has no authority or jurisdiction over the territory which formerly comprised Districts Nos. 44 and 45, and no right to collect taxes on the property therein; that the respondents Rogers and Stonum, residing in the territory of the original Districts Nos. 44 and 45, have no authority to act as directors of the School District of Lathrop. The respondents say that the proceeding was regular and that the relators are guilty of such laches as to preclude their right to have it annulled.

Evidence of considerable volume was taken and reported by the commissioner, and we find no serious conflict as to the facts. The notices of the annual school meetings in each of the districts specified, among other things, that a proposition would be submitted to extend the boundaries as stated above; that they were in regular form and duly signed by the required number of qualified voters residing in the several districts; that all the proceedings leading up to the election were regular; that a vote was taken in each district April 3, 1917, and in each district the proposition carried.

After that election no schools were held in former School Districts Nos. 44 and 45, and the children of those districts attended the Lathrop school. The school houses in Nos. 44 and 45 were sold, and the school taxes on the land in those districts were levied and collected by the School District of Lathrop.

I.   Section 11123 in Chapter 102, Revised Statutes 1919, classifies schools as follows:

"First, all districts having only three directors shall be known as common school districts; second, all districts outside of incorporated cities, towns and villages,

*Irregular Consolidation.* which are governed by six directors, shall be known as consolidated school districts;

third, all districts governed by six directors and in which is located any city of the fourth class, or any incorporated town or village, shall be known as town school districts."

The fourth relates to districts located in cities of the first, second and third classes.

School Districts Nos. 44 and 45 belonged to the first class, common school districts; the School District of Lathrop belongs to the third class, being an incorporated town and having six directors.

The statute relating to the proceeding undertaken is Section 11201, which begins with these provisions: "When it is deemed necessary to form a new district, to be composed of two or more entire districts, or parts of two or more districts, to divide one district to form two new districts from the territory therein, to divide one district  and attach the territory thereof to adjoining districts, or to change the boundary lines of two or more districts"—the proceeding to accomplish any of those results is marked out in that section, which is in Article 3, Chapter 102, relating to *common schools.*   It would apply to Districts Nos. 44 and 45, but not to the Lathrop School District.   However, Section 11253 in the same article provides that all the provisions of Section 11201 relating to the changes of boundary lines of common school districts shall apply to town, city and consolidated districts.   Thus a town school district may change its boundary lines in the same manner and according to the same procedure as common school districts.

Relators, however, contend that a proceeding to change boundary lines does not authorize the consolidation of two or more districts; that the law relating to

the consolidation of school districts does not authorize the consolidation of country districts with a town district having more than two hundred children of school age. That question was before this court in case of State ex rel. v. Scott, 307 Mo. 250, 270 S. W. 382, where in effect it was held that under the language of Section 11201 a change of boundary line between districts could not be construed so as to authorize absorption of one district by another.

Section 11252, in the article relating to common schools, provides a method by which common school districts, adjoining a city or a town, may be attached for school purposes to the city or town district. This was pointed out by the court in the Scott case, but that proceeding was not pursued in this instance.

So we have the people of the three districts attempting to accomplish a result which the law authorized, but they attempted to accomplish it in a manner which the law did not authorize. It is only on the initiative of the school district joining the town that they may be absorbed by the town district under Section 11252. If there was nothing more in the case than a question regarding the regularity of this proceeding, we would have to grant the writ of ouster.

II. The respondents, however, assert that the relators had been guilty of such laches as to require this court, in justice, to deny their right to disturb the *status quo*. At the election in April, 1917, the vote was emphatic in favor of the change; in District No. 45 it was 21 to 8, in District No. 44, 18 to 14, and in the Lathrop District, 191 to 8, indicating that the people of those districts, who voted on the proposition submitted, understood what they wanted and voted for it. The only trouble about it was, they did not pursue the method provided by statute to obtain what they wanted. There are some suggestions in the relators' argument that the people of those districts were misled or overpersuaded, but there is no evidence of that.

In District No. 45 there had been no school, at that time, for four years.  At the annual election in April, 1914, the electors of that district elected a director and voted five to four in favor of having no school; at the annual election in April, 1915, they elected a director and by a majority voted to have no school; at the annual meeting in 1916 the same proceeding occurred, and at the annual election in April, 1917, besides the proposition to extend the boundaries of Lathrop District so as to include No. 45, the voters present voted 13 to 8 for sending the children to school in town.  During those years, from 1914 to the time the extension of boundaries was voted, the children of No. 45 went to the school in the Lathrop District.  In each district, Nos. 44 and 45, after the vote in 1917, there was no school.  The school houses were sold and the land upon which they stood reverted to the original owners.  All the taxes collected in each of those districts was collected for the District of Lathrop and appropriated to the maintenance of the School District of Lathrop.  After 1917 the School District of Lathrop maintained a school of eight grades with an accredited high school of four years, employed twelve teachers and the high school was conducted for the benefit of all the children in all of said former districts.  The additional attendance from the country districts, caused by the change, necessitated, of course, a readjustment of the appliances with additional teachers and additional room.  This situation continued for eight years before the institution of this suit.  During all that time so far as the record shows, there was no complaint from the residents of former Districts 44 and 45 *who sent children to school.*  There is nothing to indicate that they were not satisfied with the school.

The relators claim that the residents of the country districts were deceived in this way:  They were promised public transportation for their children; transportation was furnished for a year or two and then was stopped.  The only witness, besides themselves, who testified for the relators was Mr. Bonham, who said the

transportation was not a success; it was abandoned for that reason. He did not explain why it was not a success. In the time that has elapsed since then, with the improved roads and means of locomotion, it is possible that it could be a success now. But no one made any complaint about that matter. There is not a particle of evidence to show that the people of those districts were misled or deceived in relation to that. The suggestion about transportation after consolidation, so far as the record shows, was made in good faith and was abandoned because impracticable. Mr. Bonham himself was not a resident of the district at the time the vote was taken; he moved into the district afterwards. The relators had no children to send to school. No one having children of school age living in former Districts 44 and 45 appears in this case as a witness to complain of any dissatisfaction with the existing conditions. Under the authorities noted below, there would have to be some reason for the disturbance of the present condition besides the irregularity in the proceeding by which it was established, in view of this acquiescence and lack of complaint in the conduct of a public institution such as a school.

III. It stands out in the record that the relators have no interest whatever in any *school,* either in the original districts or in the new district; their only purpose in bringing this proceeding is to escape the increased taxes caused by the inclusion of their land in the School District of Lathrop. This is frankly admitted by relator William R. Harrington.

Acquiescence:
Intervening
Suits.

They own about 2500 acres of land situated in the old Districts 44 and 45. This land formerly belonged to the Gighton-Harrington Mule Company, in which the relator Harrington was a stockholder and vice-president. In 1917 this land was conveyed by the corporation to William R. Harrington and William K. Harrington for a consideration of one dollar and other considerations. It may have been

upon the dissolution of the company that the property was thus divided. In June, 1919, William K. Harrington conveyed the land to William R. Harrington and Martha V. Harrington, his wife, and they thereafter held it. The Harringtons up to that time had lived in St. Louis, and had spent part of their time in Lathrop, staying at a hotel. After the conveyance to them of that land in the two districts they moved on to it. Taxes were paid on the land up to the year 1919; after 1917 the school tax was paid to the School District of Lathrop, as a part of the land embraced within that district.

In April, 1920, William R. Harrington brought suit in the Circuit Court of Clinton County against the collector and the board of education of the School District of Lathrop, in which he sought to enjoin collection of taxes for a repairing and furnishing fund for school purposes in that district. In his petition in that case he states that at all times mentioned therein he was a resident taxpaying citizen of Clinton County and of School District of Lathrop, though he testified in *this case* that he was then living on land in the original School District No. 44.

In June, 1920, he filed a suit against the directors of the School District of Lathrop to restrain them from issuing warrants for certain purposes in the petition named. In that petition he alleged that at all times mentioned therein he was a resident taxpaying citizen of the Lathrop School District of the County of Clinton. At that time, according to his testimony here, he lived on his land in the original School District No. 45. In these two suits no question was raised as to the legality of the inclusion of Districts Nos. 44 and 45 by the vote of 1917, in the Lathrop District. In the first suit the taxes which he claimed were illegal were taxes on his land in one of those original country districts. In the second suit the the warrant, which he alleged was illegal, was challenged because he was a taxpayer on land in one of those districts. Thus in both suits he assumed that the School District of Lathrop had a legal right to collect taxes on

land in former Districts 44 and 45 as within the District of Lathrop.

Later is occurred to him to question the legality of the extension of boundaries, and in June, 1921, more than four years after the vote on the extension, he brought the suit, State ex rel. v. Scott, mentioned above, against the *directors* of the School District of Lathrop, questioning their authority to exercise jurisdiction over the territory of former Districts 44 and 45. In that proceeding he did not make the School District of Lathrop a party and the ruling was against him on that point. So that the present proceeding, instituted eight years after the original vote, the regularity of which he challenges, is the first time when a proper proceeding has brought the matter to the attention of any court. After his petition was filed in *this case,* in April, 1925, at the annual school election time, a meeting was held in each of the original School Districts 44 and 45, the first meeting that had been held there in eight years. Harrington was present at both of these meetings. There were five or six other persons present at each meeting. They elected him director of District No. 44 at that time, and in District 45 they elected the wife of one of his employees as one of the directors. From the evidence it is plain that both these meetings were brought about by his activities, though he said the people came voluntarily. Only one witness besides himself and his wife testified as to what occurred or who was present at those meetings, and that was Bonham mentioned above. Harrington admitted in his testimony that he had never attended a school meeting in any of these school districts before; he admitted that his activity was not because he was interested in any school, he had no children to send to school; he had some grandchildren of school age who were going to college. He went to the meeting "to see about my property being stolen from me like you were trying to do." That was in answer to question by respondents' attorney. He was then asked if he meant by that taxes were higher in the city

of Lathrop, and answered, ''Certainly—why should I want to put my property in the city of Lathrop?''

He was then asked if his whole object and purpose of the suit was to defeat the tax on his land. He answered, ''I don't deny it. If the City of Lathrop wants a school, let them support it.'' He said then his purpose was ''not to defeat the Lathrop school, no, but to keep them from taking my property away from me.''

Then this question was asked and answered:

''Q. To get out of paying the taxes assessed by the city of Lathrop? A. To keep them from, taking my property. They got no business taking my property into the city of Lathrop.''

These and other statements of his show that he had no interest whatever in the school; that his objection to the inclusion of Districts 44 and 45 in the District of Lathrop was not in the interest of school children, nor of better schools. It was to escape the somewhat higher tax which he would have to pay in the larger district than he would have to pay in the common school districts. There is room for inference, from the evidence, that he moved onto the land, not for the purpose of becoming a permanent resident, but for the purpose of questioning the legality of the tax assessed on his land for school purposes.

Something was said in relators' argument about the failure to keep up transportation for children in the country. This was not a matter of which relator complains, because he had no children to go to school and he was not interested in any children who were going to school, and nobody sending children to school is complaining. Something was said by one witness about the petition being circulated among people of Districts 44 and 45, protesting against the change. No such petition was introduced in evidence, and if any was circulated it was done after this suit was commenced, and neither the contents nor purport of any such petition is in the record.

It is true that laches is an equity doctrine and relates to equity cases. But it is applied to municipal corpora-

tions in *quo warranto* proceedings and the like. [State ex rel. v. Town of Westport, 116 Mo. 582; Kircher v. Evers, 247 S. W. 251; Stamper v. Roberts, 90 Mo. 683; State ex rel. v. Miller, 113 Mo. App. 665.] The general doctrine is applicable to facts such as appear in this case. [State ex inf. v. Arkansas Lumber Co., 260 Mo. 284; State ex rel. v. Town of Mansfield, 99 Mo. App. l. c. 153; Kitchen v. Railroad, 69 Mo. 224; Landrum v. Bank, 63 Mo. 48; Roby v. Smith, 261 Mo. 200.] An examination of the facts in some of the cases cited will throw light on the situation here.

The Stamper case, 90 Mo. 683, supra, was a proceeding by injunction to restrain the collection of school taxes, on the ground that the school district was never legally organized, and the court had this to say, l. c. 687:

"Conceding, for the purposes of this case, without determining the question, that the change thus made was irregular and in excess of the powers conferred, the question still remains whether, under the facts of the case, a court of equity should interpose its injunctive and restraining process. The proceedings to establish this new district occurred in April, 1880; this suit, assailing its validity, was brought in 1884. In the meantime the new district was, in fact, organized, and has remained so organized, unchallenged by plaintiff, except so far as his protest when paying school taxes assessed against him may be regarded as challenging it. In view of these facts, and the further fact that, during an interval of four years, the *de facto* existence of the district was recognized and parties interested have adapted themselves to the changed condition of things, presumably for school purposes, and incurring expenses necessarily incidental to conducting a school, we are fully justified in affirming the judgment of the circuit court on the ground, if on no other, that plaintiff, by his laches, has allowed a condition of things to exist for four years which would make it inequitable to grant the relief prayed for."

That aptly applies to the situation here. Here, there was acquiescence in the *status quo* for four years. The

relator brought suit attacking the validity of the change and only questioned it after four years and *after his failure to get his taxes reduced by other proceedings.* He brought his first proceeding after four years and he brought this one, the only legal proceeding, *in eight years.* All the time his reason was, not on account of poor schools or bad management or to accomplish better school facilities, but merely to escape higher taxes.

In the Westport case, supra (116 Mo. 1. c. 593), it was held that the State may by long acquiescence and continued recognition of a municipal corporation be precluded from bringing a proceeding to deprive it of franchises long exercised. In that case the proceeding was brought twelve years after the change.

In the Evers case, 247 S. W. 251, the proceeding was to enjoin payment of a warrant on account of some alleged irregularity in the removal of a school house site. It had been acquiesced in for six and a half years, and it was held that laches prevented the remedy sought by the plaintiff.

In the case of State ex rel. v. Miller, 113 Mo. App. 1. c. 665, the regularity of district organization was brought into question. The organization occurred in 1896 and the proceeding began in 1903, and it was held that the acquiescence in the exercise of the functions of a district for that length of time were such laches as to prevent recovery.

In the case of Kitchen v. Railroad, 69 Mo. 224, it was held that a delay for two years in asserting his right prevented his recovery on account of laches.

In the case of State ex rel. v. Town of Mansfield, 99 Mo. App. 1. c. 146, the opinion was written by GOODE, J., and it was held that where a city of the fourth class had been acting as such for eight years under a decree of the county court a *quo warranto* proceeding could not oust it of its franchises for illegality in its incorporation. The warrant was denied because a judgment in favor of the relator would serve no useful purpose. The court said, 1. c. 153: ''We think every interest of the State,

such as the public peace, the security of person and property and the payment of the city's debts, would be impaired rather than promoted by setting aside the incorporation at this late day and leaving the citizens without organization, administration or corporate privileges. Unless some equity in favor of the State is shown both by averment and proof, its laches ought to preclude it from suddenly interposing to blot out the legal existence of the town after tolerating it as a working municipality for eight years."

In the case of Roby v. Smith, supra, acquiescence for one year and eight months was sufficient under the circumstances to constitute laches. This court said in an opinion by Brown, J., l. c. 200: "The right of a party seeking to set aside a sale which is not void, but merely voidable, is often barred by a lapse of time far less than the period prescribed by the Statute [of Limitations]. This for the reason that equity favors the diligent and will turn a cold face upon those who sleep upon their rights for an unreasonable period, during which time the party in possession is making permanent improvements."

In case of State ex inf. v. Arkansas Lumber Company, 260 Mo. l. c. 284, after quoting the Statute of Limitations, this court said at page 284: "There have been cases adjudged in which the rights of towns and villages to exercise their corporate franchises were brought in queston by informations in the nature of *quo warranto*. It has been held upon the doctrine of *laches,* however, that the right to investigate such matters is sometimes barred without regard to the Statute of Limitations." (Citing Westport case and the Mansfield case).

As to the length of time in which acquiescence in a situation is laches, these cases are in point: Schradski v. Albright, 93 Mo. 42, l. c. 49, where the period was six years. Scheurich v. Light Co., 109 Mo. App. 406, is where a suit was brought to abate a nuisance which they had acquiesced in for three years, and it was held barred by laches. In Shelton v. Horrell, 232 Mo. 358, the pe-

riod was nearly ten years before suit was brought to set aside a tax sale.

The facts in this case measure up almost exactly with the statement in the Stamper case, supra. The passage quoted from that case above aptly fits the condition here. The acquiescence in the changed condition was no more pronounced than here. The relator here brought this proceeding eight years after the change in boundaries. It is true he brought another proceeding in a little more than four years, but did not make the district a party.

IV. The granting of a writ of *quo warranto* is a matter of discretion. The court will not grant it unless some good purpose can be served by it. [State ex rel. v. Cupples, 283 Mo. l. c. 145.] The quotation above from the language of Judge Goode in the Mansfield case aptly fits this case. Unless some equity in favor of the State is shown, its laches ought to preclude it from attempting to cancel the proceeding by which the School District of Lathrop was extended and cause the injurious results which would follow from the disorganization of that district. The inclusion of Districts 44 and 45 in the District of Lathrop was undoubtedly intended to secure better school facilities for the children of those districts, as well as the District of Lathrop. District 45 had had no school for four years. District 44 wanted the change. The result was a high school as well as a grade school. The best facilities were offered by the city for the education of its children, facilities which were denied children of these two districts before their inclusion in La-throp District. There is not a suggestion in the record that there could possibly be any improvement of the schools or school facilities or the opportunities for the children of former Districts 44 and 45 to go to school, by restoring the former condition. On the contrary, it is a reasonable inference that they would not be served as well. District 45 had no school and the children there had to go to Lathrop before the change. Thus without

any evidence that the school conditions would be improved, but with a situation which suggests that they would be impaired, with no complaint from any one who had school children or is interested in any school, this court should exercise its discretion and deny the relief sought.

The proceeding is dismissed. All concur, except *Otto, J.*, not sitting.