STATE OF MISSOURI, AT THE INFORMATION OF ROY McKITTRICK, AT-
TORNEY-GENERAL, PETITIONER, v. R. C. SEIBERT, ANDREW J.
HAVERSTICK, A. O. OZMENT, HERMAN BARKEN, MATT C. FOGERTY
AND LEO P. FITZGERALD, RESPONDENTS.—65 S. W. (2d) 129.

St. Louis Court of Appeals.   Opinion filed November 7, 1933.

Opinion modified and relator's motion for rehearing overruled December 4,
1933.

*Roy McKittrick*, Attorney-General, *Harry G. Waltner, Jr.*, As-
sistant Attorney-General, *Rubey M. Hulen* and *Forrest M. Hemker*,
of counsel, for petitioner.

1134

*John J. Nangle* and *Sarpy Noonan* for respondents.

SUTTON, C.—This is a *quo warranto* proceeding brought to oust respondents from office as alderman of University City.

The petition alleges that University City, in St. Louis County, is a city of the fourth class, having a population in excess of 25,000 inhabitants; that on April 5, 1932, the respondents A. O. Ozment, Matt C. Fogerty and Leo P. Fitzgerald, and on April 3, 1933, the respondents R. C. Seibert, Andrew J. Haverstick, and Herman

Barken, unlawfully usurped and intruded themselves into the offices of aldermen of said city, and have ever since continued to unlawfully hold and exercise said offices, respondents A. O. Ozment, Matt C. Fogerty and Leo P. Fitzgerald claiming to have been elected as aldermen by virtue of an election held in said city on April 5, 1932, and respondents R. C. Seibert, Andrew J. Haverstick, and Herman Barken claiming to have been elected as aldermen by virtue of an election held in said city on April 3, 1933; that said elections held as aforesaid are null and void, for the reason that no registration of the qualified voters of said city was held prior to April 5, 1932, or April 3, 1933, under the laws which provide that there shall be a registration of all the qualified voters in the cities of this state having a population such as University City had on the respective dates of said elections.

The cause has been submitted here on a demurrer to the petition.

As we understand the contention of the learned attorney-general, it is, that University City, being located in a county having a population of more than 150,000, must cause a registration of the voters within the city to be made prior to each municipal election separate from and independent of the registration of the voters of the county made under the direction of the County Board of Election Commissioners. It is urged that such city registration is required by the provisions of Article 15, Chapter 61, Revised Statutes 1929, or, if not by that article, then by Article 16 of said chapter.

Section 10503, of Article 15, is as follows:

"In all counties of this State now having, or which hereafter may have, one hundred and fifty thousand inhabitants or over, there shall be a registration of all qualified voters; and the conduct of elections held in such counties shall be governed by the provisions of this article; *provided,* that where any city in such counties already has a system of registration as provided for in Article 17, Chapter 61, Revised Statutes 1929, this article shall not apply to such city, but only to such parts of such counties as lie outside the corporate limits of any such city."

Article 17, referred to in said Section 10503, provides for registration in cities having 100,000 inhabitants or more. The only cities in the State coming within this classification are Kansas City and St. Louis. The only counties in the State having a population of 150,000 or over, respectively, and therefore coming within the classification of Article 15, are Jackson County and St. Louis County. St. Louis County has no city within its borders having a population of over 100,000 so as to come within the classification of Article 17. Kansas City, in Jackson County, has a population of over 100,000, and therefore comes within the classification of said article, so that Article 15 does not apply to said city, but only to such parts of Jackson County as lie outside the corporate limits of such city.

Article 18 of said Chapter 61 provides for registration in all counties having, or which may hereafter have, a population of more than 100,000 and less than 150,000.

Section 10540, of Article 16, is as follows:

"There shall be a registration of all the qualified voters in cities of this State, now or hereafter having a population of ten thousand inhabitants and less than one hundred thousand inhabitants, except in cities in counties which now have or hereafter may have one hundred thousand inhabitants or more and registration is provided for by law, whether organized under general law or special charter, which registration shall be had under the provisions of this article; and the population of cities within this State containing such population shall for the purpose of this article be ascertained from and determined by the last decennial census taken by the Federal government."

This article was enacted in 1925, amending previous statutes so as to reduce the population limit from 25,000 to 10,000, obviously in compliance with section 5 of Article 8 of the Constitution, which was adopted in 1924, amending the old Section 5 of the Constitution of 1875, which fixed the population limit at 25,000. Said Section 5 of Article 8 of the Constitution, as adopted in 1924, is as follows:

"The General Assembly shall provide by law for the registration of voters in counties having a population of more than one hundred thousand and in cities having a population of more than ten thousand, but not otherwise. The first General Assembly held after the adoption of this Constitution shall pass laws necessary to enforce this provision, and for such purpose may classify such counties and cities according to population, but such laws shall be uniform as to each class."

Obviously Article 15 of the statute does not require municipal registration in cities located in counties having a population of 150,000 or over, as distinguished from registration required to be made in such counties under the direction of the Board of Election Commissioners. This is so, because there is an utter lack of any provisions for such municipal registration. No municipal system of registration whatever is prescribed. No Board of Election Commissioners, or Board of Registry, or other body, is provided for to conduct or direct such registration.

Section 10510, of said Article 15, is relied on by the attorney-general, as follows:

"This article shall not apply to elections for public offices determined otherwise than by ballot, to township or village elections, to school elections, or elections of county commissioners of public schools, or municipal elections in cities under 5,000 inhabitants."

It is urged in argument that since this section provides that Article 15 shall not apply to municipal elections in cities under

5,000 inhabitants, it does apply by implication to all cities in such counties having a population in excess of 5,000, unless registration is already provided for in such cities under Article 17. In other words, it is urged that the implication is that the article applies to municipal elections in cities having a population of 5,000 or more in the sense that municipal registration is required for such cities. Manifestly, there is no such implication. The fact alone that the article makes no provision for carrying out or conducting municipal registration forbids such implication. The implication to be indulged is obvious, that is, that the county registration made under the provisions of Article 15, which, of course, includes the registration of all qualified voters in cities as well as the rest of the county outside of the cities, shall apply to municipal elections in all cities having a population of 5,000 or more. The purpose of this section is to exclude from such application elections for public offices determined otherwise than by ballot, township or village elections, school elections, elections of county commissioners of public schools, and municipal elections in cities having under 5,000 inhabitants.

The attorney-general quotes and relies on the following provision of Section 10537 of Article 15 of the statute, as follows:

"All general elections embracing the whole county or any office not exclusively a city office the expense specifically incurred for such election shall be paid by the county. In all city elections the expense specifically incurred for such city election shall be paid by the city."

It is argued, it seems, that this section shows by implication that municipal registration is required, else the Legislature would not have provided for the payment by the municipality of the expense of such registration. It will be observed, however, that the section does not provide for the payment by the city of the expense of registration, but merely provides for the payment by the city of the expense of the election. There are expenses of a municipal election other than the expenses of registration. Surely the section dos not imply that the city must necessarily incur in a municipal election any expense for registration. Moreover, a subsequent clause of the section provides that in "all towns and village incorporated, the expense specifically incurred for any election for offices solely within such towns or villages shall be paid by such towns and villages," and it will be observed that Section 10510, of Article 15, expressly excludes village elections from any application of the article, so that municipal registration for village elections could not possibly be required under any construction of the article. Yet Section 10537 expressly requires villages to pay the expense of village elections. To carry the argument of the attorney-general to its logical conclusion we would have to hold that municipal registration is required for village elections.

Section 10534 of Article 15 appears to be a somewhat outgrown

section. It has given no little trouble in the construction of the statutes relating to registration. It reads as follows:

"In all cities or towns in such county, having a population of not less than five thousand nor more than twenty thousand inhabitants, in all municipal elections the provisions of this article shall apply as regards to intermediate registration, revision of the registry and election; *provided*, that in all special elections, or elections to fill vacancies, the registration books of the last preceding registration may be used, and no intermediate registration shall be required."

The section first appears in the Session Laws of 1917 at page 291. It appears unchanged in the Revised Statutes of 1919 as Section 5083, in the Session Laws of 1921, at page 326, and in the Revised Statutes of 1929 as Section 10534. The section was evidently enacted to meet conditions in Jackson County, which, until 1930, was the only county in the State having a population of 150,000 or more, according to the last decennial census of the United States, and which has never had a city within its borders, except Kansas City, with a population in excess of 20,000. St. Louis County, until 1930, had, according to the last decennial census, a population of more than 100,000, but less than 150,000, so that it came within the classification of Article 18.

It is interesting, and pertinent as well, to note the origin and growth of Article 18. It was first enacted in 1923, and appears in the Session Laws of that year at page 179. Section 1 of the article, as then enacted, is as follows:

"In all counties of this State now having, or which hereafter may have, according to the last United States decennial census, more than one hundred thousand and less than one hundred and fifty thousand inhabitants, and adjoining a city now having or which may hereafter have a population of six hundred thousand or more inhabitants there shall be a registration of all qualified voters, and the conduct of elections, including primary elections, held in such counties shall be governed by the provisions of this act. Provided, however, that the provisions of this act shall not apply to elections for public offices determined otherwise than by ballot, to town and village elections, to public school elections, to elections of county superintendent of schools, nor to municipal elections in incorporated cities which have a population of less than twenty-five thousand, such population to be determined by an official census. Provided further that in all municipal elections and elections in city and consolidated school districts only voters who are registered and qualified to vote at county elections shall vote, and provided further that the city and school officials having charge of such city or school election shall obtain from the Board of Election Commissioners a certified copy of a list of all registered voters of such city or school district."

The article was re-enacted, with certain amendments, in 1927, and

appears in the Session Laws of that year at page 186. Section 1 of the article, as thus re-enacted, now appears without amendment as Section 10662 of the Revised Statutes of 1929, as follows:

"In all counties of this State now having, or which hereafter may have, according to the last United States decennial census, more than one hundred thousand and less than one hundred and fifty thousand inhabitants, there shall be a registration of all qualified voters, and the conduct of elections, including primary elections, held in such counties shall be governed by the provisions of this article. *Provided, however,* that the provisions of this article shall not apply to elections for public offices determined otherwise than by ballot, to municipal elections, to town and village elections, to public school elections, to elections of county superintendent of schools, nor to elections in city, town or consolidated school districts."

The article, as enacted in 1923, was evidently intended to meet the conditions in St. Louis County, which had just come into the constitutional class of counties having a population of 100,000 or more and within the classification of the article as a county having a population of 100,000 and less than 150,000, according to the last decennial census. It was then the only county in the State coming within this statutory classification, and St. Louis County and Jackson County were the only counties in the State coming within the constitutional classification of counties having over 100,000.

It will be observed that Section 1 of the article, as enacted in 1923, provides that the article shall not apply to municipal elections in cities having a population of less than 25,000. It also provides that in all municipal elections only voters who are registered and qualified to vote at county elections shall vote. When the article was re-enacted in 1927, this section was amended so as to make the article inapplicable in any respect to municipal elections without regard to population. This doubtless resulted from the fact that at that time there was no city in St. Louis County coming within the constitutional classification of cities having a population of more than 10,000, according to the last decennial census.

Now, the decennial census in 1930 put St. Louis County within the statutory classification of counties having a population of over 150,000, and put University City within the classification of cities having a population of 10,000 and less than 100,000; but it also put University City beyond the population of 20,000 the maximum limit of the classification prescribed in Section 10534. So that this section originally enacted to meet the conditions in Jackson County, which has no city of 20,000 inhabitants or more, outside of Kansas City, finds itself without application, at least in its express terms, to University City, though such city is located in a county which has now come into the same classification with Jackson County.

In view of this history and the manifest purpose of the statute,

1140

said Section 10534, we think, might well be construed as applicable to University City, as well as any other city in St. Louis County, or Jackson County outside of Kansas City, having a population of 10,000 and less than 100,000; but, though the section be so construed, it does not require, either in express terms, or by implication, municipal registration in such cities. It does, however, seem to imply that the county registration made under the provisions of Article 15, of which it is a part, shall apply to all municipal elections in such cities.

The coming of St. Louis County into the classification of Article 15 leaves Article 18 without a county in the State within its classification, and, of course, without any city to which its provisions could now in any respect apply. It is clear, however, that there is nothing in the provisions of the article requiring municipal registration in cities in counties that may hereafter come within the classification of the article, for Section 10662 of the article, by its express terms, excludes, from any application whatever of the provisions of the article, all municipal elections.

It remains to be seen whether or not Article 16 requires municipal registration in cities of 10,000 and less than 100,000 inhabitants located in counties which now have or hereafter may have 150,000 inhabitants or more. It is argued that if Article 15 does not require municipal registration in such cities, then Article 16 does so. require. because it requires such registration in all cities now or hereafter having a population of 10,000 and less than 100,000, "except in cities in counties which now have or hereafter may have 100,000 inhabitants or more and registration is provided for by law." This language of the section is construed by the attorney-general to except cities of 10,000 and less than 100,000 inhabitants in which municipal registration is provided for by law. We do not think, however, the language may reasonably be so construed. It does not except cities of 10,000 and less than 100,000 inhabitants in which municipal registration is provided for by law, but excepts cities of 10,000 and less than 100,000 inhabitants which are located in counties in which county registration is provided for by law, that is, of course, cities in counties having a population of 100,000 or more. To construe the section, as the attorney-general construes it, as excepting from the operation of Article 16 cities as to which municipal registration is provided for by law, would convict the Legislature of the folly of making an exception that excepts nothing, for neither Article 15, nor Article 18, nor any other law, makes provision for municipal registration in cities of 10,000 and less than 100,000 in counties having a population of 100,000 or more. There could be no reason for making such an exception, for such an exception would leave such cities precisely where they would have been, within respect to the

operation of Article 16, had the exception not been made. The exception ought to be construe dso as to serve some purpose.

It may be helpful to observe that no such exception appeared in the statute until 1925, following the constitutional amendment reducing the minimum constitutional limit for municipal registration from 25,000 to 10,000 inhabitants, obviously because, until this reduction was made, there was no city, in any county in this State having a population of 100,000 or more, coming within the constitutional requirement for municipal registration, except Kansas City provided for in Article 17. Accordingly, in 1925, following the constitutional amendment, the Legislature, by an act appearing in the Session Laws of that year at page 203, in order to meet the amendment of the Constitution, reduced the minimum population limit for municipal registration from 25,000 to 10,000, and then found it necessary, in order to meet conditions in Jackson County, to except cities in counties having a population of 100,000 or more, since county registration in such counties was already provided for by law. This exception, first appearing in 1925, was brought down into the revision of 1929, without amendment, and still persists in an enactment of the last Legislature, appearing in the Session Laws of 1933 at page 239, with an amendment confining the exception to cities in counties having a population of 150,000 or more, manifestly made because there is now no county in the State having a population of 100,000 or more and less than 150,000, and the only cities in the State that could now be affected by the exception are cities in counties having a population of 150,000 or more.

Though there appears to be some confusion in the various provisions of the statute, the intention of the Legislature, which is the pole star of construction, is quite clear, that duplicate systems of registration, one for municipal elections, and another for county and state elections, shall not be required. This intention runs like a red line throughout all the legislation on the subject.

We agree with the attorney-general that the statute ought to be construed. if so it may be, so as to meet the requirements of Section 5 of Article 8 of the Constitution. We are not prepared to say, however, that the statute, as we have construed it, does not meet substantially such requirements. Article 17 of the statute provides for registration in cities having a population of 100,-000 or more. Article 16 provides for registration in cities having a population of 10,000 and less than 100,000 located in counties having a population of less than 100,000, in which counties there is no provision for county registration. Article 15 provides for county registration in counties having a population of 150,000 or more, which county registration does not apply to any city already having a system of registration as provided for in Article 17, but only applies to such parts of such counties as lie outside the cor-

porate limits of any such city. The Legislature evidently deemed the county registration provided for by Article 15 to meet the requirements of said Section 5 of Article 8 of the Constitution for municipal elections in cities of 10,000 and less than 100,000 inhabitants in such counties, as well as for county and state elections. Respecting registration for municipal elections in cities of 10,000 and less than 100,000 inhabitants in counties that may hereafter have a population of 100,000 and less than 150,000 so as to come within the classification of Article 18, the Legislature will doubtless enact any further needed legislation to meet the conditions when they arise, thus pursuing the same policy obviously long since adopted and since pursued by the Legislature. But whether the statute, as we have construed it, meets the requirements of said Section 5 of Article 8 of the Constitution or not, it is· impossible to otherwise construe the statute, or give it the construction insisted upon by the attorney-general, without reading into it provisions which the· Legislature. did not see fit to write into it. Said Section 5 of Article 8 of the Constitution is not self-enforcing. This is conceded. And we cannot enforce registration except in so far as the statute has made provision for it.

There is nothing in State ex rel. Faust v. Thomas (Mo.), 282 S. W. 34, relied on ·by the attorney-general, in conflict with the view herein expressed. No question was· involved in that case respecting registration in cities in counties having a population of more than 100,000.

Nor do we see anything in State ex rel. Meyer v. Woodbury (Mo.), 10 S. W. (2d) 524, out of accord with our view. The question reviewed in that case was the right or not of an elector to be registered in a ward in Kansas City. What was there said with respect to the amendment to the registry act in· 1925, as we read it, seems to be in exact accord with what we have said here. Surely, it is not out of accord with what we have said.

Furthermore,· in view of the fact, apparently conceded in the briefs of counsel, that ·the citizens of University City have, ever since the city came within the classification of cities of 10,000 and less than 100,000 inhabitants in counties of 150,000 or more, construed the strued the statute as we construe it, and have held their municipal elections accordingly, and hitherto no citizen nor the sovereign state has taken any steps to interfere with such elections, or to question their validity, or to compel registration, so that it has now come to pass that there is no elective officer in the city, if the attorney-general's view ·is correct, that was legally elected, and if one is to be ousted so must they all, thus leaving the city ·practically disorganized, we are not convinced, though we should yield to the view of the attorney-general respecting the construction of the statute, that this court, in the exercise of a sound discretion, ought to grant its

writ of ouster. The granting of a writ of *quo warranto* is a matter of discretion. The writ is not granted where there has been laches, or long acquiescence, or where ouster would not be in the public interest, or serve any good end or purpose. [State ex inf. Attorney General v. School District of Lathrop (Mo.), 284 S. W. 135, 1. c. 140; 51 C. J. 332.] If municipal registration be required, there is a very simple remedy for its enforcement. [State ex inf. Faust v. Thomas (Mo.), 282 S. W. 34.]

The Commissioner recommends that the demurrer to the petition be sustained, and the respondents discharged.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court.

The demurrer to the petition is accordingly sustained, and the respondents discharged. *Becker, P. J.,* and *Kane* and *McCullen, JJ.,* concur.