STATE of Missouri on the Information of Thomas F. EAGLETON, Attorney General, Relator,

v.

Norman B. CHAMP, Joseph Champ, Bill Bangert, Rosemary Bangert, and Archie Null, the purported Trustees of the Village of Champ, Missouri, and the Village of Champ, Missouri, a Municipal Corporation, Respondents.

No. 49734.

Supreme Court of Missouri,

En Banc.

July 12, 1965.

Opinion Modified on Court's Own Motion and Motion for Rehearing or for an Order Retaining Jurisdiction Denied Sept. 13, 1965.

Thomas F. Eagleton, Atty. Gen., of Missouri, James J. Murphy, Asst. Atty. Gen., James M. Douglas, Sp. Counsel to Atty. Gen., David F. Ulmer, Edwin D. Akers, Jr., Sp. Asst. Attys. Gen., Jefferson City, for relator.

John A. McCarty, Clayton, T. E. Lauer, Columbia, Riddle, O'Herin & Newberry, Malden, for respondents.

Norman C. Parker, St. Louis County Counselor, Joseph B. Moore, Associate County Counselor, John J. Collins, Asst. County Counselor, for St. Louis County, Mo., amici curiæ.

FINCH, Judge.

This is an original action in quo warranto filed September 4, 1962, ex officio by the Attorney General of Missouri, as relator. Count I seeks to have the original order of incorporation of the Village of Champ, entered by the St. Louis County Council on January 14, 1959, declared invalid and void, and Count II seeks a similar ruling with reference to a purported order of annexation of additional territory entered by the County Council on September 5, 1962. An order ousting the individual respondents from their village offices and preventing them from exercising authority over the territories is sought.

The Honorable Harry C. Blanton was appointed by this court as Special Commissioner to take testimony, make findings of fact and conclusions of law, and submit a recommendation to this court. He has made his report and has recommended denial of relator's prayer in Count I with reference to the original incorporation and the granting of relator's prayer of ouster in Count II with reference to the annexation.

Evidence taken by the Special Commissioner discloses these facts: In 1957, or perhaps earlier, Mr. Bill Bangert and some associates conceived of a plan which they named Metro. It involved the construction of a domed, all-weather sports stadium to seat 115,000 people. A three-level restaurant seating 1500 was to be suspended at the top of the dome. An underground, multi-level parking garage under the stadium was to have a capacity of 27,000 automobiles, and be adapted to conversion to a civil defense shelter accommodating 600,000 people in the event of a nuclear attack. There were to be two and one-half million square feet of adjacent shopping facilities, plus office space. The plan was to locate Metro in northwest St. Louis County near Interstate Route 70 and the proposed circumferential highway, in an incorporated village to be established.

On May 12, 1958, a petition was filed with the County Council of St. Louis County asking it to incorporate approximately 840 acres as a village under the provisions of § 80.020. (All references are to RSMo 1959, V.A.M.S., unless otherwise indicated.) This area included the site where Metro was to be constructed. Following procedure prescribed by the Charter of St. Louis County, the petition was referred to various agencies, including the St. Louis County Planning Commission. It recommended that the petition for incorporation be denied. This original petition to incorporate the Village of Champ was never acted on by the County Council. Subsequently, on November 12, 1958, an amended petition was filed with the County Council, this time describing 314.3 acres and asking that it be incorporated as the Village of Champ. This revised area still included the site where Metro was to be located. The unverified amended petition was signed by eleven persons who purported to be more than two-thirds of the taxable residents of the area sought to be incorporated. The County Planning Commission again recommended against incorporation, stating, in part, that the proposed

village " * * * does not meet the minimum standards for an incorporated area." The matter was investigated by the County Council and on January 7, 1959, a public hearing was conducted. On January 14, 1959, the Council entered its order approving the incorporation and appointing five trustees of the village.

The 314.3-acre tract included in the village as incorporated was bounded roughly as follows: On the north by Interstate Route 70, on the east by the incorporated municipality of Bridgeton, and on the south and west by unincorporated areas. Generally, the tract was at the top of rolling land which adjoins the bottomlands of the Missouri River. The river was located approximately one and one-half miles to the west. On the south side of the incorporated area there was a roadway known for a portion of the distance as McKelvey Road and thereafter as Creve Coeur Mill Road. The actual south boundary of the incorporated village as established by the County Council was set back 200 feet from these roadways, apparently at the suggestion of the St. Louis County Highway Engineer for reasons that had to do with possible issuance of tax bills by the county at a future date for the improvement of Creve Coeur Mill Road.

Within the incorporated area proper there were seven houses, a school and a church. The church and the school were located on Penn-Junction Road, which was a public road extending in a northerly direction for a distance of approximately 465 feet from its intersection with Creve Coeur Mill Road. The Penn-Junction Baptist Church had been constructed as a mission church in 1956 and had a membership of about 140, of whom one person lived in the incorporated village. The church was about 500 feet from Creve Coeur Mill Road. Penn-Junction School was located about 800 feet from Creve Coeur Mill Road. It was built in 1954 as a consolidation of two rural schools located in the Pattonville School District. In 1958 it had about 235 students, of whom six or eight lived in the incorporated area.

A private roadway known as Branneky Lane ran northwardly from the end of Penn-Junction Road to the residence of the Branneky family, which was just beyond the north boundary of the village as established in the order of incorporation. Six of the houses in the incorporated village were located along Branneky Lane. Two of them, known as the Barklage and Null houses, had been there many years. The other four, described by everyone as substandard houses, were built between 1955 and a time which was about a year before the original order of incorporation. The seventh house, known as the Cook house, was located a half mile or so west of Branneky Lane and was located on a 110-acre farm. The Cooks had a driveway from their place directly to Creve Coeur Mill Road and did not use Branneky Lane. Apparently they had an easement across the Null farm to Branneky Lane and there was a dirt lane located there but it was used very infrequently and was not the means of access used by the Cooks. Incidentally, Bill Bangert bought the Cook house in the fall of 1958 and moved into it with his family in December of 1958. There were five additional houses immediately adjacent to the incorporated area which were excluded from the tract actually incorporated as the Village of Champ. The Branneky residence at the end of Branneky Lane was excluded, although apparently one of their farm buildings was included in the village limits. This house had been there for many years, as had its occupants. The reason for its exclusion is not clearly shown in the record. In addition, the King residence and three Miller residences, located in the 200-foot strip separating the incorporated area from Creve Coeur Mill and McKelvey Roads, were excluded at the request of the County Highway Engineer. All of the houses were occupied and had been there for a number of years.

Approximately 30 of the 314.3 acres in the incorporated village were used for building sites, lawns and streets. The remainder of the village area, which would have been approximately 284 acres, was used for agricultural purposes or lay in rough, wooded land. Estimates of the portion thereof actually used for farming ranged from 150 to 220 acres. At the time of the original incorporation the area surrounding the village as incorporated largely was vacant or used for agricultural purposes. Starting at about that time, however, there was a residential development to the south across Creve Coeur Mill Road in an unincorporated area. Various housing developments were started in that area at that time and grew rapidly thereafter. Bridgeton, to the east, also was growing.

The Metro Plan was based on the hypothesis that the stadium and accompanying commercial development would be municipally owned and would be financed through the issuance of revenue bonds. Bonds could not be issued by an unincorporated area and hence a municipal entity was required. The Plan itself would use 208 of the 314.3 acres in the original village. The 208 acres included the area where the church, school and houses (other than the Cook house) were located. There were plans for relocating all of these in the remaining village area.

After the incorporation of the village, the 1959 Missouri General Assembly passed legislation which would have enabled the Village of Champ to own and finance the Metro project, but the act was vetoed by Governor Blair. Thereupon the conclusion was reached by the trustees that Champ should annex Missouri River bottomland adjacent thereto and develop it as an industrial park, with a possibility of building the stadium in the original village area at a later date. Bangert arranged for various studies and surveys at his expense, following which steps were taken by the Village of Champ seeking to annex approxi-

mately 3100 acres of additional land for the express purpose of developing it as an industrial park. The area was located between the original village and the Missouri River, extending northwardly to where it was bounded by Bridgeton. Approximately one-half of the 3100 acres was located north of Interstate Route 70. Nearly all of the 3100 acres were used for agricultural purposes. Only two dwelling houses were located within this entire area. In addition, there was a newly erected plant of Pre-Stress Horizon (a manufacturer of concrete beams). The area had been subject to flooding in times past, but levees had been built and there had been little flooding since 1951. The plans developed contemplated raising the levees, plus putting in additional drainage canals and pumping facilities, in order to protect the area from flooding. This entire area was zoned by St. Louis County as one-acre, single-family residential. The county had no agricultural classification in its zoning ordinance.

The first annexation petition was filed September 6, 1960, and was denied by the County Council on February 8, 1961, after the County Planning Commission recommended against it. Thereafter, on October 30, 1961, a new petition was filed covering essentially the same 3100 acres of land. The avowed purpose for the annexation remained the same. This time the Planning Commission favored the plan. A public hearing was held on August 22, 1962, and the petition to annex was granted by order of the County Council on September 5, 1962, one day after relator had filed the quo warranto proceeding attacking the original incorporation. Count II, attacking the annexation, was added subsequently by amendment.

There was considerable other evidence presented to the Special Commissioner. Much of it concerned who were taxpaying inhabitants and whether the requisite number of them signed the petition to incorporate, the nature of hearings held by the County Council, what were the motives or purposes which prompted petitioners to seek

the incorporation, whether Champ performed services after its incorporation, matters relating to the subsequent annexation proceeding involving the additional 3100 acres, and the activities of Bill Bangert in either acquiring title to or options to purchase practically all of the land in the original Village of Champ and in the annexed area. To the extent that such evidence is pertinent and necessary to the points hereinafter considered, it will be detailed subsequently in this opinion. The evidence not necessary to this decision will not be summarized.

St. Louis County is a charter county and its County Council, established under its charter, is charged with the duties normally performed by the county court in most counties. It acted on the petition to incorporate the Village of Champ under the provisions of § 80.020. That section provides in part as follows: "Whenever two-thirds of the taxable inhabitants of any town or village within this state shall present a petition to the county court of the county, setting forth the metes and bounds of their village and commons, and praying that they may be incorporated under a police established for their local government, and for the perservation and regulation of any commons appertaining to such town or village, and the court shall be satisfied that two-thirds of the taxable inhabitants of such town or village have signed such petition, and that the prayer of such petition is reasonable, the county court may declare such town or village incorporated, designating in such order the metes, and bounds thereof, * * *."

Relator's attack in Count I on the original incorporation of the Village of Champ is based on the following contentions: (1) The County Council had no jurisdiction to incorporate the Village of Champ because (a) there was no pre-existing village, (b) the boundaries as drawn excluded people and property which should have been included if a village did exist, and (c) only about 30 acres or approximately ten per cent of the 314.3 acres included were de-

voted to houses and accompanying grounds, church and school grounds and streets, with somewhere between 150 and 220 acres of the remaining land being devoted to agricultural uses, and the remainder being in rough, wooded areas; (2) the order incorporating Champ was void because the required two-thirds of the taxable inhabitants did not sign the petition to incorporate, and (3) the order incorporating Champ was void because it was not for valid municipal purposes, but for the private purposes of Bill Bangert and his associates to develop the Metro Plan.

Relator asserts, and respondents concede, that quo warranto is the proper remedy to test the valid existence of a municipality and the validity of exercise of municipal jurisdiction over territory. There are numerous cases so holding, among them State ex rel. Patterson v. McReynolds, 61 Mo. 203, and State ex inf. Rosenberger v. Town of Bellflower, 129 Mo.App. 138, 108 S.W. 117. There is a divergence of opinion between relator and respondents as to the extent and nature of the review and inquiry in quo warranto in such an instance. In substance, respondents say that the inquiry is limited to determining the regularity of the proceedings and whether there was sufficient evidence before the County Council to enable it to exercise its lawful discretion. Otherwise, say respondents, it is necessary to allege and prove actual or legal fraud in order to attack the incorporation, and unless both alleged and proved, the order of incorporation is not subject to attack in a quo warranto proceeding. Of this we will have more to say later.

The landmark case in Missouri dealing with the right in quo warranto to inquire into the power or jurisdiction of the county court to incorporate an unincorporated town or village was the case of State ex rel. Patterson v. McReynolds, 61 Mo. 203. The evidence in that case disclosed that the unincorporated town of Butler, in Bates County, covered somewhere between 250 and 300

acres. A petition was filed with the county court seeking to have it incorporate the town of Butler, and the petition described approximately 1200 acres, including the 250 to 300 acres actually occupied by the existing unincorporated town of Butler. The remaining acreage consisted of adjacent farming country. Thus 75 to 80 per cent of the land included in the petition and in the town as incorporated by the county court was being used for farming purposes. In a quo warranto proceeding this court held that under the statute on which the county court relied in incorporating the town, "no power is conferred on county courts to incorporate a farming country not constituting a part of the town or village or the commons belonging thereto." 61 Mo. 203, 209.

Respondents contend that the rule laid down by this court in the above McReynolds case was modified in the later opinion of this court in the case of State ex rel. Crow v. Flemming, 158 Mo. 558, 59 S.W. 118. That case involved quo warranto against the officers of Webster Groves, Missouri, which had been incorporated by order of the County Court of St. Louis County. The record disclosed that there were between 2000 and 3000 inhabitants of the unincorporated town and that all of the land incorporated by the county court, except about 70 acres, had from time to time been subdivided and platted. The court noted that even though houses had not yet been built thereon, an intention to dedicate the land to urban uses was disclosed and that the present temporary use of the land for agricultural purposes did not change the character of the property to other than urban. With reference to the McReynolds case, the court in Flemming went on to say, 59 S.W. 1. c. 120: "While it is true that the county courts of our state have no right to incorporate farming or agricultural lands, as such, into cities or towns, as was attempted in the McReynolds Case, supra, yet lands used for agricultural purposes solely may become so surrounded and connected with lands used for town and city

purposes, as to be and constitute a part thereof, so that the incorporation of the town or city would, as a necessity, include within its natural boundaries such lands; and this court has three times held since the opinion in the McReynolds Case, supra, that the inclusion of small tracts of agricultural lands within the corporate limits of the incorporated town would not operate to defeat the corporation thus created. State [ex rel. Meriwether] v. Campbell, 120 Mo. 396, 25 S.W. 392; Burnes [ex rel. Cook] v. City of Edgerton, 143 Mo. 563, 45 S.W. 293, and Copeland v. City of St. Joseph, 126 Mo. 417, 29 S.W. 281." What the court in Flemming said earlier in its opinion with reference to the courts in quo warranto not touching the order and finding of the county court absent allegation and proof of fraud was said with reference to determining who were taxable inhabitants and whether a sufficient number of them had signed the petition. With reference thereto the court said, 59 S.W. 1. c. 119: "These are not jurisdictional facts, essential to the county court's right to hear and determine the matter, but facts the existence or nonexistence of which the court must determine upon after it has acquired jurisdiction." The Flemming case, in our judgment, did not modify the rule, as announced in the McReynolds case, that county courts have no right or jurisdiction to incorporate surrounding or adjacent farming lands into cities, towns or villages. It simply recognized that lands being used for agricultural purposes could become such an integral part of an unincorporated town, lying within its natural boundaries, as to be properly includable in the town or village created by the county court, even though it might not be formally subdivided and platted. The facts in that case justified such a holding. To the extent it might be construed as stating otherwise, it is dicta and not controlling. Respondents also cite and rely on State ex rel. Scott v. Lichte, 226 Mo. 273, 126 S.W. 466, a prohibition case rather than one in quo warranto. When the court speaks therein of including land not platted, it says it is to be "adapted to urban

purposes, and necessary or convenient to a reasonable exercise of the village government." This does not indicate a rule contrary to what we have stated herein.

The doctrine of the McReynolds case was followed in two subsequent opinions by Courts of Appeals, to wit, State ex inf. Rosenberger v. Town of Bellflower, 129 Mo.App. 138, 108 S.W. 117, and State ex rel. White v. Small, 131 Mo.App. 470, 109 S.W. 1079. The Bellflower case involved two unincorporated towns, Bellflower and New Bellflower (apparently the two towns occupied a total of approximately 330 acres), plus a 39-acre wedge-shaped agricultural tract between the two towns, and 600 acres of farmland surrounding and adjoining the two towns. The petition contained no allegations of fraud, but was based on the proposition that the inclusion of a large area of farmlands resulted in the county court exceeding its jurisdiction, making its judgment of incorporation void. The court discusses the earlier McReynolds and Flemming cases and holds that the inclusion of the 39 acres of agricultural land in the wedge-shaped area between the two towns was not improper, but that the county court exceeded its jurisdiction in including the 600 acres of surrounding agricultural lands. The 39-acre tract in effect was surrounded by the two towns and within their natural boundaries, even though not platted. The 600 acres of adjacent farmlands were not. The incorporation was held void. In the course of its opinion, the court says, 108 S.W. l. c. 119: "The point is made by defendants that quo warranto is not the proper remedy. It is also contended that the judgment of the county court is final and conclusive, and cannot be disturbed except for fraud. This is a mistaken idea. It is true that had the county court acted within its jurisdiction its judgment could not be attacked in this proceeding, except upon allegations of fraud or connivance. State ex rel. [Crow] v. Fleming, supra; State ex rel. [Chandler] v. Huff, 105 Mo.App. 354, 79 S.W. 1010. But where the county court has no jurisdiction to ren-

der a judgment in the proceeding, or, having jurisdiction of the subject-matter, proceeds to render a judgment in excess of its jurisdiction, the judgment is void and its validity may be attacked even collaterally. The decisions and authorities are all one way that the state, by its Attorney General or by the prosecuting attorney of the county in which the town is situated, may attack the validity of the incorporation of a town by a proceeding in the nature of quo warranto. State ex rel. [Crow] v. Fleming, supra; State ex rel. [Patterson] v. McReynolds, supra; State ex rel. [Musser] v. Birch, 186 Mo. 205, 85 S.W. 361; [First Nat.] Bank [of Deadwood] v. Rockefeller, 195 Mo. [15], loc. cit. 42, 93 S.W. 761, and cases cited."

The case of State ex rel. White v. Small, supra, involved quo warranto against the Trustees of the Village of Anniston, in Mississippi County. The county court of that county made an order incorporating a section of land as the Village of Anniston, though the existing unincorporated village occupied only about 40 of the 640 acres. In ordering ouster, the court said, 109 S.W. l. c. 1082: "A gross abuse of authority occurred when the county court of Mississippi county incorporated an entire section as part of the village, which occupied at the time about 30 or 40 acres of land; and, under the authority of the McReynolds Case, we must hold the order of incorporation a nullity."

Respondents also cite and rely upon the subsequent opinions of the St. Louis Court of Appeals in the cases of State ex inf. McKittrick ex rel. Oehler v. Church, Mo. App., 158 S.W.2d 215, and State on Inf. of Wallach ex rel. H. B. Deal & Co. v. Stanwood, Mo.App., 208 S.W.2d 291. These cases involved the Villages of Crystal Lake Park and Warson Woods, in St. Louis County. We will not lengthen this opinion by a detailed review of these cases, but a reading of them will disclose a factual situation far different from that in the McReynolds case and different from the facts in the instant case. In the Church case lots

had been platted and private drives constructed, about 75 houses had been built, and a club house, restaurant, swimming pool and golf course had been developed. Appellant was complaining about his contiguous 15-acre tract which was not developed and which was included in the incorporation. In the Stanwood case the total area incorporated covered 348.5 acres along Manchester Road. It was traversed by three streets running in a general north and south direction. It was surrounded on all sides by existing municipalities. There were houses and living quarters throughout the area, and there were various places of business. There was no showing that the area included large tracts of unassociated agricultural lands. Obviously, the language used by the St. Louis Court of Appeals in ruling those cases did not overrule the earlier controlling decisions of the Supreme Court.

Respondents also cite and rely upon Petition to Incorporate the City of Duquesne, Mo., 322 S.W.2d 857. In that case the County Court of Jasper County denied a petition to incorporate approximately 3200 acres as the City of Duquesne. The evidence indicated that there was a population of about 900 persons, and that approximately 490 acres out of the total had actually been subdivided. The county court found that approximately one-half of the total acreage, or about 1600 acres, was being used for agricultural lands. The circuit court, on appeal, affirmed the county court, and the Springfield Court of Appeals then did likewise. The case was then transferred to the Supreme Court, which affirmed. In the course of its opinion this court said, l. c. 863: "We are of the opinion the Legislature intended that the unincorporated cities or towns to be incorporated under § 72.080 should correspond in some reasonable degree in population and area with an incorporated city of the class involved, comprising a compact center of population, and might include, to the extent proper, a suburban area having a unity of interest therewith; and that it was not the intent of the Legislature that a rural or agricultural area having no natural connection with and not constituting a part of the unincorporated city or town be included." This quotation does not indicate necessarily a departure from what has been said in the earlier cases about being so situated or surrounded as to lie within the natural boundaries of the village, and we hold it did not change the rule as announced in earlier cases.

A reading of the record in this case leads us to the inescapable conclusion that much and probably most of the area incorporated by the County Council on January 14, 1959, was not within a pre-existing unincorporated village. We find no exact definition of a village either in the statutes or decided cases to serve as a guideline. In State ex inf. McKittrick ex rel. Oehler v. Church, supra, 158 S.W.2d l. c. 220, the question of what constitutes a village was discussed, as follows: "The statute does not define the word village, so that it should be given its ordinary and usual meaning. Webster's New International Dictionary, Second Edition, Unabridged, defines 'village' as 'Any small aggregation of houses in the country, being in general less in number than in a town or city and more than in a hamlet.' 2 Bouv.Law Dict., Rawle's Third Revision, p. 3401, defines the word as, 'Any small assemblage of houses for dwellings or business, or both, in the country, whether they are situated upon regularly laid out streets and alleys, or not.'" In State ex rel. Scott v. Lichte, supra, 126 S.W. l. c. 470, we said: "The name 'village' always carries to the mind the idea of a small urban community."

■ The Special Commissioner decided that the County Council could have found that a village existed, and we cannot say with certainty that the County Council, based on the evidence, would not have been justified in finding the existence of a village. If the County Council had incorporated an area which started at the Creve Coeur Mill Road and included the three Miller residences and the King resi-

dence and then ran along Penn-Junction Road and Branneky Lane so as to include the Penn-Junction Baptist Church, the Penn-Junction School, the Barklage and Null houses, the four little houses built along Branneky Lane between 1955 and 1958, and finally the Branneky house at the end of Branneky Lane, it would be difficult to say that this area would not constitute an unincorporated village, even though there was very slight evidence that the inhabitants of that area functioned together as a unit. This, however, the County Council did not do. They left out the Branneky residence, even though the line was drawn immediately adjacent to the Branneky home and included one of its outbuildings and some of its agricultural land within the limits of the village. In addition, the Miller residences and the King residence were excluded. The explanation was that the latter were excluded at the request of the County Highway Engineer, but his request would not alter the situation as to whether those were or were not a part of an existing unincorporated village. Section 80.020 authorizes the county court to incorporate a village and its commons. It does not provide that part of a village may be incorporated. It is reasonable to assume that the Legislature meant the whole village. We find no case in Missouri on the subject, but we are inclined to believe that the Texas court reached the correct result in the case of State v. Perkins (Tex.Civ.App., 1962), 360 S.W.2d 555, when, in substance, the court held that their statute would not authorize the creation of a municipal corporation out of a portion of territory which comprised an unincorporated town, but rather the whole must be included.

 Even more clearly, the order of incorporation of the County Council included land which was not a part of the pre-existing village, even accepting the premise that a village did exist. The Cook residence and the 110-acre farm on which it was located was not a part of an existing village. It was one-half mile away from Branneky Lane. It was reached by an en-

tirely different access road from Creve Coeur Mill Road than was used by the houses located along Penn-Junction Road and Branneky Lane. Only approximately ten per cent of the total area incorporated was located in roads, building sites and houses and grounds, and this percentage included the Cook house. The rest of the 314.3 acres consisted of agricultural land and rough, timbered areas. The record in this case is devoid of evidence to show that the 280 plus acres not devoted to roads, houses and grounds and building sites were necessary or required as a matter of convenience to a reasonable exercise of village government. There was no proof to show that this acreage was an integral part of an existing unincorporated village and so surrounded as to lie within the natural boundaries of the village as established. The testimony and exhibits indicate to the contrary. Proof offered in support of the propriety of including this acreage consisted solely of proof as to the value of the property and of sale prices or offers to purchase, indicating values ranging from $1500 to perhaps $5000 per acre. Respondents say this evidence discloses that obviously the highest and best use of this land is urban, not agricultural, and therefore its inclusion in the Village of Champ was proper and justified. Certainly anyone with knowledge of farming will know that a reasonable return cannot be made from farming operations on lands which range in value from $1500 to $5000 per acre. The highest and best use thereof must be something else. The difficulty is that this is not the test which was prescribed by the Legislature in § 80.020. If it were the test, then probably there is little land in St. Louis County which would not be eligible to be incorporated as a town or village. If the test is the value of the land, and if a high value in and of itself makes the land urban and therefore eligible for incorporation as a village, it would seem obvious that the County Council of St. Louis County properly could incorporate most any area in St. Louis County. On that basis, even the 3100 acres later annexed to Champ, and which

contained only two houses, might be eligible to be incorporated as a village, or at least to have been included as part of the original incorporation on the basis that it was urban in character. Perhaps, as respondents contend, the development of industrial villages is desirable and even necessary, and the right to incorporate land of this character should exist, but if that be true, such authorization must be sought from the Legislature, and not from the courts. Our function is to adjudicate, not legislate.

■ The Special Commissioner appointed by this court recommended against the ouster sought in Count I of the petition, but he did so on the basis of his finding that there was a presumption of correct action by the County Council in the absence of substantial proof to the contrary, and in the absence of allegation and proof of fraud. He did, however, in his finding also recite that proof of existence of a village was meager, that 90 per cent of the tract was either agricultural or rough land, that population density was low in the area incorporated, and that there was doubt as to the wisdom of the incorporation. We agree with the view of the Special Commissioner that doubt is resolved in favor of the County Council action in so far as it pertained to the matter of whether the petition was signed by the requisite number of taxpaying inhabitants and under the facts here as to whether there was a pre-existing village, but we rule that on the question of jurisdiction we are not bound by the decision of the County Council. If there was no jurisdiction, or if the County Council exceeded its jurisdiction, it is our obligation in quo warranto to so determine, based on the evidence presented to us through our Special Commissioner.

■ We are of the opinion that the record in this case shows that from the outset there never was really any attempt or intent to incorporate a pre-existing village. The first petition to incorporate the Village of Champ filed with the County Council described approximately 840 acres. Ap-

parently it became obvious that this would not be incorporated, and subsequently an amended petition was filed reducing the area described to 314.3 acres. Significantly, in each instance, the area to be incorporated fully included the 208 acres which was to be the site of Metro. That Plan, from the outset, actually contemplated the complete relocation of all buildings in what was then the existing village, if there was one, because all of that particular area was to be covered with Metro. We do not mean by these statements to infer that in passing on the incorporation of a town or village in quo warranto, we will look into and ascertain the motivating factors leading inhabitants to seek incorporation of a town or village, if in fact one exists. We mention these facts only as further disclosing that the area described was not occupied solely by an existing unincorporated village and its commons and that the lines were not drawn with that in mind.

On the basis of our conclusion, it follows that we should enter a judgment of ouster under Count I, unless, as respondents contend, the lapse of time between the incorporation of the village and the institution of this action and the events which have occurred during that period are such that the relator is barred by laches or estoppel from now inquiring into the validity of the original incorporation.

In support of a plea in their return of laches and estoppel, respondents offered evidence intended to show that during the three years and eight months between the incorporation of Champ and the date of the filing of this action in quo warranto, individuals and companies took various steps and expended money in reliance on its corporate existence, various officials and agencies of the State dealt with and recognized the existence of Champ and in some instances encouraged others to contract with the village and locate there, and the village itself functioned. The evidence offered established these facts: After the County Council appointed the original trustees for the village, they held regular monthly meet-

ings and kept minutes showing business transacted and ordinances passed. Elections were held each spring to elect trustees to fill the positions of those trustees whose terms were expiring. A zoning ordinance was adopted. Building permits were issued for additions to the school and church and for the construction of a plant for the use of R. C. Can Company. The trustees approved the appointment of an attorney for Champ and he was directed to prepare necessary ordinances. The employment of Schmidt and Black, a firm of architects, was approved. The firm of Harland Bartholomew and Associates was employed to make a study and prepare reports on development of the Village of Champ, including a general development plan, proposed zoning, tax structure, possible extension of village limits, and handling of vehicular traffic. Printed brochures containing maps, plans, graphs and detailed explanations were prepared and distributed. The Champ minute book contains no entry to show employment of the Bartholomew firm but it does contain references thereto and there was testimony that the plan of Bartholomew had been adopted by the Village of Champ. In connection with plans to issue revenue bonds under the 1959 legislative proposal, and under a constitutional amendment which was adopted by the State of Missouri, representatives of Champ (primarily Bangert) made trips and consulted with bond houses and bond attorneys. These were reported on and recorded in the village minutes. An Architect-Engineer Study, including a Foundation and Soils Report, was prepared by Schmidt and Black, Architects, Henson, Collins & Rice, Consulting Engineers of Springfield, Illinois, and Professor Thornburn of the University of Illinois. It was printed and distributed. Champ made application to the Missouri Division of Resources and Development for permission to issue revenue bonds for an industrial development program. A special attorney was employed to handle this matter and a contract made fixing his compensation. Approval of the Division of Resources and Development was

given, after which an election was called by the trustees, notice thereof in regular form was published in the newspapers, and the election was held. The bonds were approved but have never been issued. Champ employed a Civil Defense Director and a Plan of Civil Defense was prepared and submitted to the State Civil Defense Agency. Proof of approval thereof by the State was offered in evidence. The village had negotiations, frequently mentioned in its minutes, with the Missouri State Highway Commission relative to road construction programs and access from Champ to Interstate Route 70. Champ was told to submit plans and it employed a firm of engineers which prepared and submitted plans to the Highway Commission and negotiated regarding same with representatives of the Commission. Eight-page advertising supplements in color to the St. Louis Post-Dispatch edition of Sunday, March 4, 1962, and to the Globe-Democrat of Sunday, June 24, 1962, were printed. These were devoted exclusively to advertising and promoting the Village of Champ and were distributed widely. Bill Bangert made many trips to various parts of the country to attempt to interest firms in locating in the Village of Champ. One trip to New York was made at the invitation of the Missouri Resources and Development Commission and in company with a Commission representative. They called on various New York firms to interest them in locating plants in Champ. The man who served as Civil Defense Director also served as Director of Research and Industrial Development for the village and he made trips to both the East and West Coasts promoting the Village of Champ, reporting thereon to the trustees on his return. The Governor of the state wrote to Mr. Bangert as a trustee of the Village of Champ, urging support in backing Missouri's continued industrial development. He enclosed a copy of an advertisement on behalf of the State of Missouri which was to appear in Fortune, the New York Times and the Wall Street Journal. This was reproduced in the Village of Champ rotogravure supple-

ment of March 2, 1962, to the St. Louis Post-Dispatch. The Secretary of State of Missouri mailed out the Village of Champ brochure to 7500 industries throughout the United States, promoting interest in the village. The Director of the Missouri Resources and Development Commission wrote many companies about the village, urging that they locate there. Negotiations were conducted between Champ and the Pattonville R–3 School District concerning a possible relocation of the existing school and a trade for that purpose. In that connection, the Pattonville R–3 School District also was interested in the possibility of taxing lessees of property in the Village of Champ, and the evidence discloses that in January 1962, the school district took up with the Office of the Attorney General of Missouri this question of taxation of lessees. On January 4, 1962, that office wrote and acknowledged receipt of the inquiry concerning taxability of certain proposed constructions in the Village of Champ, and furnished a copy of a prior opinion dealing with essentially the same question. In each of these contacts with the State of Missouri there was no hint of any kind that the State might raise a question concerning the validity of the incorporation of the village. Instead, its existence was recognized and its development encouraged. Meanwhile, Bill Bangert and others interested in the village were expending substantial sums on its behalf. At no time has the village ever levied and collected any taxes. Instead, Bangert apparently paid the architects, the engineers, the lawyers, the Director of Research and Civil Defense and others who performed services. Presumably, he also paid the various travel expenses. Bangert, the Carl G. Stifel Realty Company (exclusive real estate agent for land owners in the village) and perhaps others paid for the rotogravure supplements. Various companies visited Champ and displayed an interest, and the R. C. Can Company contracted with Bangert to erect a large plant for them adjacent to Interstate Route 70. The president of that company testified that he relied on the existence of the village in contracting to lease the plant in question. The president of the lending institution which made the loan on that building testified that the existence of the village was a factor in his institution agreeing to make the loan. Carl G. Stifel, whose company had made loans on property located in the village and in the area it sought to annex, as well as purchasing some land there, stated that loans would not have been made or the property purchased except for the corporate existence of Champ.

The rule has existed in Missouri for many years that the State may be barred by laches from successfully maintaining an action in quo warranto attacking the validity of a village, city or school district. State ex rel. Brown v. Town of Westport, 116 Mo. 582, 22 S.W. 888; State ex inf. Otto ex rel. Harrington v. School District of Lathrop, 314 Mo. 315, 284 S.W. 135; State on Inf. of Wallach ex rel. H. B. Deal & Co. v. Stanwood, Mo.App., 208 S.W.2d 291; State ex inf. Dalton v. Taylor, Mo. App., 293 S.W.2d 12; State ex rel. Crain v. Baker, Mo.App., 104 S.W.2d 726; State ex rel. Jackson v. Town of Mansfield, 99 Mo.App. 146, 72 S.W. 471. We will not lengthen this opinion by a detailed review of each of these cases. They recognize the basic principle that the doctrine of laches or estoppel is available as against the State or another entity such as a school district, and that there is no fixed amount of time which must elapse, each case being decided on its particular facts. In the School District of Lathrop case and in State ex rel. Crain v. Baker, supra, the periods of acquiescence were four years, approximately the same amount of time as is involved in this case. In some of the cases it was a longer period. In most of the cases the court discussed and relied upon what persons or agencies had done in reliance on the corporate existence of the municipality or school district and what harm would result from ouster. Frequently the court mentioned also that there was no showing of any detriment to accrue from

permitting the municipality to continue, and that the court would not grant quo warranto unless some good purpose would be served. State ex inf. Otto ex rel. Harrington v. School District of Lathrop, supra; State ex rel. Crain v. Baker, supra. The granting of the writ is discretionary. State ex inf. Otto ex rel. Harrington v. School District of Lathrop, supra.

In this case the relator made no showing of any detriment to the State or public to follow if the original incorporation of the Village of Champ is permitted to stand. On the contrary, if its existence is terminated, very considerable amounts of time, effort and money expended during the three years and eight months are consigned to the wastepile, much of which would have been avoided by an early attack on the validity of the original order of incorporation. Relator asserts we should not be concerned therewith for the reason that these expenditures and efforts were not by the village itself, but by the persons who were advancing and promoting the Village of Champ and Metro. We think this is of no consequence. They were made on behalf of and for the benefit of the village, as well as its promoters, and were made in reliance on the corporate existence of the village pursuant to order of the St. Louis County Council made after a hearing was conducted thereon. Whether the expenditures were out of funds first collected by the village from its property owners or directly by those persons seems immaterial under the facts here presented.

■ Adverting again to the lapse of time between incorporation of the village and the filing of this proceeding in quo warranto, it cannot be said that not sufficient time elapsed for the State to have knowledge and an opportunity to act more quickly. Actually, the village was in the news from the very outset. The village was incorporated in January 1959. Legislation was proposed and passed by the General Assembly in the spring of 1959 for the purpose of enabling the Village of Champ to construct and finance Metro as a combination commercial and civil defense facility. That bill was vetoed by Governor Blair in July of 1959, more than three years before institution of the quo warranto proceeding. Almost immediately the village then sought to develop as a nationally recognized industrial village. These and subsequent events were ample to focus considerable attention on the village. Under all the circumstances shown, we hold that the lapse of time and the actions taken during that period are sufficient to bar ouster under Count I of the information. Relator contends there is not a showing of reliance to one's detriment on representations made and hence there can be no estoppel, but as this court said in State ex rel. Brown v. Town of Westport, supra, 22 S.W. 1. c. 890, "[N]or are we disposed to place the result of our deliberations strictly on the ground of estoppel, but rather because of laches on the part of the state."

What then of Count II wherein the State attacks the order of the County Council of September 5, 1962, extending the boundaries of the village to include 3100 additional acres?

■ The information in quo warranto filed by the Attorney General named as respondents the persons acting as Trustees of the Village of Champ. On the following day the order extending the village limits was entered. When the information was amended by relator to add Count II attacking the annexation, respondents filed a motion to dismiss Count II, asserting as one ground the fact that the Village of Champ was not made a party defendant. Various cases were cited as authority for the proposition that, in instances wherein an extension of limits is attacked, the municipality or school district involved is a necessary party to the proceeding. State ex rel. Crow v. Flemming, 158 Mo. 558, 59 S.W. 118; State ex inf. Pulley ex rel. Harrison v. Scott, 307 Mo. 250, 270 S.W. 382; State ex inf. Prosecuting Attorney ex rel. Hutsell v. Chipley, 233 Mo.App. 61, 116 S.

W.2d 140. We have concluded that the Village of Champ is a necessary party respondent. Rather than dismiss Count II, we ordered, pursuant to Civil Rules 52.04 (b) and 52.06(a), V.A.M.R., that the Village of Champ be added as a party respondent and granted leave to relator to amend its information accordingly. This has been done, the appearance of the Village of Champ has been entered, and all parties have stipulated that the case shall proceed on the basis of the evidence and briefs heretofore presented.

 The relator's objection to the addition of the Village of Champ as a respondent was based on earlier pronouncements of this court that addition of the municipality itself as a party respondent "would have been a recognition of the lawful existence of the very corporation which the informants by the proceeding against the individual respondents sought to impeach the validity of. The proceedings in this case against the individual respondents and against the city would have been inconsistent." State ex rel. Crow v. Flemming, supra, 59 S.W. 1. c. 121. We have concluded that this rule as stated in the foregoing quotation from the Flemming case is unsound and should be and is hereby overruled. Relator should not be foreclosed from attacking an original incorporation just because a subsequent annexation also is to be questioned. Certainly there would be no logic in requiring that one proceeding be limited to the original incorporation, and then, if that is unsuccessful, requiring a second proceeding to attack the annexation. Rules of pleading have been liberalized, alternative pleading is permitted, and we hold that it is permissible, in separate counts in the same information in quo warranto, to attack both an original incorporation of a municipality or school district and a later annexation thereto. The addition of the Village of Champ as a party respondent, along with the trustees of the village, in order that both the original incorporation of the village and the extension of its limits may be attacked in separate counts in the same information, does not result in a recognition by relator of the validity of the original incorporation, nor does it result in any waiver on the part of relator.

The evidence relative to the annexation disclosed that there had been no development within the original Village of Champ between the date of incorporation and the date of annexation. No houses had been constructed, no businesses started (other than plans for construction of the R. C. Can Company, partially within the village), no streets laid out and dedicated, no subdivision plats filed, and no utilities installed. Approximately nine-tenths of the area of the original village still was being farmed or was in rough, wooded area. Champ had levied no taxes, had no income, and made no village expenditures. The 3100-acre tract to be annexed was all farmland. There were only two residences on the entire tract. None of it had been platted as a subdivision to the Village of Champ, and no residential construction was in progress or prospect. In fact, the avowed purpose of the annexation was to attempt to attract industry and create subsequently an industrial municipality with no residential construction to be permitted in the annexed area. One plant to make concrete beams was under construction, and plans were completed for start of construction of a plant for the R. C. Can Company. There was evidence as to what could be done to develop the area for industry and of some prospects of attracting companies to the annexed area. Most of the original village area was to be reserved for Metro in the hope that subsequent developments would make it possible. Approximately 100 acres of the original incorporated area would be available for residences, including the school, church and houses which were to be moved if Metro was developed.

The Special Commissioner found that the Village of Champ was not equipped to supply any services to the annexed area, that the extension of boundary limits was not for any valid municipal purpose nor

was it necessary to make the boundaries of the village even and regular. He concluded that the order was beyond the jurisdiction of the County Council because it was totally unreasonable and constituted an abuse of discretion. He recommended ouster.

The position of respondents with reference to the annexation may be summarized thus: § 80.030, under which statute this annexation was ordered, authorizes inclusion of two types of land, to wit: (1) Any tract or tracts of land, any part of which has been improved, and (2) any land adjoining the village that has been or shall be subdivided into town lots or streets and a plat filed as an addition to such town or village with the recorder of deeds. When a hearing has been held by the county court, or in St. Louis County by its county council, and the annexation has been ordered, the only question involved in a proceeding in quo warranto attacking same is whether, based on evidence before the county council, the boundary extension was "just and proper." Respondents say that the Sawyers Act is not applicable to annexations by villages and that necessity and ability to furnish municipal services have nothing to do with it. Respondents' brief phrases the question for the court to decide as being "whether facts within the Council's knowledge were such that no reasonable man in possession of such facts could have decided in favor of the boundary extension."

■ We agree with respondents that § 80.030 permits annexation of tracts which have been partially improved, as well as lands which have been platted as additions to the town or village. It also permits annexation of land necessary to make the boundaries even and regular. Respondents apparently seek to justify the annexation of the 3100 acres on the basis that the land had been partially improved because there was no evidence that the 3100 acres had been platted as a subdivision to the town or village of Champ, and it hardly could

be contended that it was necessary to add 3100 acres to a 330-acre village in order to make the boundaries even and regular. The evidence disclosed that there were two farm residences on the annexed area. In addition, there was a plant to make concrete beams. Plans were complete, or substantially so, for the R. C. Can Company plant, but construction had not been started. It would take a considerable stretch of the imagination to conclude that this amount of building on a 3100-acre tract falls within what the Legislature contemplated in § 80.030 when they authorized annexation of any tract or tracts, any part of which had been improved. The case cited by respondents in support of their position is State ex rel. Hart v. Whitaker, Mo.App., 218 S.W.2d 121. An examination of that case disclosed that the only issue on appeal involved the propriety of the annexation by the town of Holcomb of a tract approximating 1000 feet in length by 390 feet in width and containing less than ten acres. It was adjacent to the Frisco Railroad and contained two residences and a cotton gin to which persons brought their cotton for custom ginning. The Court of Appeals held that the burden was on relators to show that the annexation was unjust, unreasonable, unnecessary and illegal. It held further that the discretion of the county court in ordering the annexation would be overruled only when there was a grave abuse of that discretion, and that there was ample evidence to justify the annexation of the tract in question as improved property. That decision is not a basis for holding that annexation of the 3100-acre tract as partially improved property was "just and proper" and not an abuse of discretion.

■ It has been firmly established in decisions of this court that reasonableness of annexation by a city always is the subject of judicial inquiry. Such judicial review has been provided by the Legislature in certain instances by § 71.015, com-

532

monly referred to as the Sawyers Act. However, it has been held that reasonableness of annexation is the subject of such judicial inquiry even in instances in which the Sawyers Act is not applicable. For example, in the case of McDonnell Aircraft Corporation v. City of Berkeley, Mo., 367 S.W.2d 498, the City of Berkeley, a constitutional charter city, claimed that no court could judicially review charter amendments for annexation of territory by a constitutional charter city to which the Sawyers Act was not applicable. That position was rejected by this court which stated, l. c. 502, that "[t]he policy of the state in this respect as to all cities is stated in Sec. 71.015 (statutory references are to RSMo and V.A.M.S.) in the requirement '[t]hat such action is reasonable and necessary to the proper development' of the city." Subsequently, l. c. 503, the opinion states: "Therefore, our conclusion is that annexation of additional territory is a matter of more than merely municipal affairs and concern and that the reasons for applying the test of unreasonableness amounting to arbitrary, capricious action and abuse of discretion are equally applicable to annexations by constitutional charter cities and those organized under general statutes." See also City of Hannibal v. Winchester et al., 391 S.W.2d 279, decided by this court on June 14, 1965, wherein it was held that a charter city may annex unincorporated territory under Art. 6, § 20, 1945 Missouri Constitution "subject to a test in the courts of the reasonableness and necessity of its action." In determining the question of reasonableness the court does not substitute its discretion or judgment for that of the legislative body, but "its consideration of 'reasonableness' is confined to a determination of whether there exists a sufficient showing of reasonableness to make that question, at the least, a fairly debatable one." City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 8.

Respondents assert that the Sawyers Act is not applicable to annexations to villages. The St. Louis Court of Appeals so held in Emerson Electric Mfg. Co. v. City of Ferguson, 376 S.W.2d 643. On this basis, respondents contend that the annexation to the Village of Champ is not subject to the judicial review of reasonableness such as has been applied to annexations by cities, whether under the Sawyers Act or otherwise as in the City of Berkeley case. We cannot agree and we find no language in § 80.030 to lead us to that conclusion. The net result of respondents' contention would be a holding that the Legislature intended that towns or villages could make practically unlimited annexations (as contrasted with annexations by cities based on need and services) so long as the county court (here the St. Louis County Council) found same to be "just and proper". The only judicial review thereof, say respondents, would be in a direct appeal from the action of the county court. We do not agree. It is our view that the policy of the state includes judicial review of the reasonableness of annexations to towns and villages, based on testimony heard by the court. This yardstick is applicable in a judicial determination of whether the extension was "just and proper," the language used in § 80.030.

We concur in the finding of the Special Commissioner that the extension of the boundaries of the Village of Champ was unreasonable and constituted such an abuse of discretion by the County Council that it should be set aside by this court. The record discloses that the whole tenor of this annexation was not that partially improved property was being annexed, but rather was that the area should be added to the village so as to permit future developments thereon in a giant industrial park. The same theme appears in respondents' brief wherein they say that "perhaps the

central consideration in this entire case is whether a planned community can be created in Missouri by beginning with a small nucleus of population and a sizeable area of vacant land, and creating a plan for the orderly, comprehensive development of the land area." Actually, respondents urge that we ignore what they refer to as "judicial encrustations" on the existing statutes and determine that they are broad enough to meet the needs of a modern, industrialized society by authorizing annexation to a town or village of a large undeveloped area which could be developed into an industrial park. We repeat that this is a plea which must be addressed to the Legislature, not to the courts.

In our view, relator has sustained his burden of showing that the annexation was unreasonable and constituted an abuse of discretion.

The prayer of Count I to set aside the original incorporation of the Village of Champ and to oust the individual respondents from their offices as trustees of the Village of Champ is denied. With reference to Count II, it is adjudged that the annexation to the Village of Champ ordered by the St. Louis County Council on September 5, 1962, is set aside and the Village of Champ is ousted from that area. In addition, respondent trustees are ousted from exercising any authority over that area in their capacity as trustees of the Village of Champ.

Other questions were raised in the briefs filed herein, but are not necessary to the decision we have reached and those questions are not ruled upon.

It is ordered that one-half of the costs be taxed against relator and one-half against respondents.

All concur, and STONE, Special J., concurs.